IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | Case No. 03 CR 300 - 1 |
| ) | |
| MARY CAPRI ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Mary Capri pled guilty to a charge of mail fraud arising from her participation in a scheme to defraud Western United Life Assurance Company (WULA). The purpose of this Memorandum Opinion and Order is to summarize the reasons for the Court's imposition of a sentence of twenty-seven months imprisonment.

### Facts

**1. The offense**

Between December 2001 and April 2002, Capri worked as a mortgage broker and assisted co-defendant Scott Serfling to secure a loan for his company Serfin Trust LLC, for the purported development of a Ford automobile dealership in Gurnee, Illinois. As part of the effort to secure the loan, Capri provided WULA financial information that she knew or at least strongly suspected was fraudulent. This included false tax returns, financial statements, and bank statements concerning the borrower. In April 2002, WULA loaned Serfin Trust LLC $11,750,000, partly on the strength of the fraudulent information Capri had provided.

Capri herself received over $280,000 from the proceeds of the loan. She falsely represented to WULA that Geneva Lake Insurance, a company she had set up, had placed

insurance on the dealership property, and she created phony documentation to substantiate her representation. Capri did this knowing that based on this false information, Geneva Lakes would receive $225,000 from the loan proceeds. Capri took this money and used it for her own purposes, including the purchase of a home in Lake Geneva, Wisconsin. Capri received another $58,000 from the loan proceeds, representing a brokerage fee for her role in the purchase of the dealership property.

After the fraud was exposed, WULA took possession of the dealership property and sold it for $5,000,000. WULA suffered a loss of $6,750,000. Capri's co-defendant Scott Serfling has pled not guilty, and his case is set for trial in September of this year.

**2.    Capri's family circumstances**

Capri is 34 years old and has four children. She told the probation officer that her mother physically abused her as a child. She contends her mother suffers from schizophrenia and receives disability benefits due to that condition; however, no evidence has been provided to substantiate the claim. Capri likewise contends that a number of her siblings suffer from this same mental illness; this likewise has not been verified.

Capri's oldest child, Brandon, is seventeen years old and receives Supplemental Security Income disability benefits. The report from the administrative law judge who found Brandon disabled reflects that he had been hospitalized for an "acute thought disorder with hallucinations" and had a history of hallucinations. Def. Ex. 5. The defense has provided a copy of a report from an emergency room visit documenting this assessment. Def. Ex. 7. The ALJ's report also states that a representative of a local health department reported a diagnosis of attention deficit hyperactivity disorder and "possible psychotic changes"; that school records indicated possible

2

ADHD and Asperger's disorder (a developmental disorder similar to autism); and that psychological testing was "suggestive of schizophrenia." Def. Ex. 5. The records supporting these assessments have not been provided to the Court. The ALJ made a finding that Brandon had severe ADHD and schizophrenia. *Id.* Though he had been in a special education program, Brandon was home-schooled by Capri prior to her March 2005 arrest on unrelated fraud charges. He is now in a special education program at a local high school and is living with his father, Alexander Alcarese.

Capri's second oldest child, Jordan, is also living with Alcarese, his father. Jordan is thirteen years old. There is no indication that he suffers from any mental, physical, or developmental disorder.

Capri's two younger children, Jonathan and Christian, both are or were living with their father, Capri's former husband John Rabine. Jordan, who is nine years old, was found by the Social Security Administration to be disabled. The SSA's findings reflect that he suffers from "pervasive developmental disorder with autistic features" and ADHD. Def. Ex. 6. Jonathan is in a special education program.

The youngest child, Christian, is seven years old. Following Capri's recent arrest, he went to live with his father, but Rabine reported that he could not handle taking care of both children, so Christian is now living with Capri's sister, Dorothea Gale. The defense contends that Gale suffers from schizoaffective disorder,[1] but there is nothing to verify this contention. Christian is described as a "special needs" child, but few details are provided, and the Court has

---

[1] Schizoaffective disorder is characterized by hallucinatory symptoms in a person with a mood disorder, such as a manic or major depressive episode, that continue for a period after the manic or depressive episode ends. *See* Diagnostic and Statistical Manual of Mental Disorders at 292-96 (4th ed. 1994).

3

been given no information regarding any psychiatric or other diagnosis.

Capri claimed to the probation officer that she had received counseling as a pre-teenager for depression and hearing voices and had attempted suicide when she was twelve or thirteen years old. There is no indication in the record, however, that Capri has the type of thought disorder characteristic of schizophrenia or other psychotic disorders; auditory hallucinations can be a symptom of severe depression and other mood disorders. *See* Diagnostic and Statistical Manual of Mental Disorders at 377 (4th ed. 1994) ("DSM-IV"). An October 1999 report from a psychiatrist with a county health department in Wisconsin reflects a diagnosis of "major depression with possible psychotic symptoms," namely auditory hallucinations reported by Capri. A psychologist with the same department who evaluated Capri in 2001 reflects that she had again reported hearing voices and claimed she had attempted suicide. The psychologist reported a diagnostic impression, based on interviews and psychological testing, of "major depression, recurrent, with psychotic features," and "personality disorder, not otherwise specified, with schizoid and narcissistic traits and avoidant features." The term "personality disorder" is used to describe pervasive patterns of behavior that deviate markedly from the expected norm; "schizoid" traits involve detachment from social relationships, and "narcissistic" traits involve grandiosity, the need for admiration, and lack of empathy. DSM-IV at 629, 638, 658. The psychologist recommended therapy, assistance in managing stress, and medication if prescribed by a psychiatrist. Def. Ex. 18.

In November 2004, a clinical social worker who had counseled Capri following the return of charges in the present case reported that she was subject to significant stress factors, including anxiety regarding the possible outcome of the case, severe financial problems, medical problems,

4

and being a single mother with four children, including two special needs children. The social worker reported that "[t]here are unusual aspects to [Capri's] personality and thought process, but she is not psychotic" and had been "resourceful and resilient" in dealing with her many problems. The social worker reported it was "possible" that Capri could "decompensate psychologically" if sentenced to a prison term. Def. Ex. 20. The Court notes, however, that there is no indication of such "decompensation" by Capri after approximately four months of detention on the March 2005 fraud charge.

### 3.     Capri's criminal history

Capri has a significant prior criminal history. According to the presentence report, in 1993 she was charged with a felony forgery offense in Illinois, and in 1994 she entered a guilty plea. The charge arose from an attempt by Capri to secure a loan under a false name. The loan was approved, but Capri's scheme was discovered before the proceeds were disbursed. The presentence report in the case reflected Capri's admission that she had researched credit ratings of recently deceased persons, prepared phony identification and supporting information for the deceased persons if they had good credit ratings, and applied for loans in fictitious names. Capri received a sentence of probation. In 1996, her probation was revoked for reasons that are not disclosed in the current presentence report. A new term of probation was imposed, along with a community service obligation.

In 1998, Capri pled guilty to another felony forgery charge in Illinois state court, arising from an incident in January 1994, and she received a sentence of probation and community service. There are few details regarding this charge in the current presentence report. In discussions with the probation officer in the present case, Capri reportedly denied her guilt of this

5

charge and contended she had not gone to court on the charge because she was pregnant at the time. However, records from the court reflected Capri's presence in court with counsel. The defense does not dispute the accuracy of the information in the presentence report regarding this conviction.

In 1999, Capri was charged in federal court with corruptly endeavoring to obstruct the due administration of the internal revenue laws. The presentence report in that case reflected that between January and July 1993, Capri filed nineteen fraudulent tax returns for the year 1992, using false names and Social Security numbers and fictitious financial information. The returns claimed refunds totaling about $40,000 altogether. Capri told the probation officer in that case that her mother had induced or assisted her to become involved in this offense. Capri pled guilty in 1999, and in 2000, she received a split sentence of six months in custody and six months of home confinement, followed by one year of supervised release.

**4.   Capri's detention for another offense and its effect on her family circumstances**

Capri pled guilty to the present charge in June 2004. In March 2005, while awaiting sentencing, Capri was arrested on a separate fraud charge arising from her alleged submission of a fraudulent loan application to Entrust Mortgage Inc. on behalf of a purported purchaser of her home. The affidavit of the investigating FBI agent submitted in support of the government's request for an arrest warrant described an apparent scheme to concoct a phony purchase of Capri's home by a deceased person in order to obtain loans totaling $640,000. Capri was denied bail on the charge and is currently awaiting trial before another judge of this Court. Because she is presumed innocent of the charge, the Court does not consider it as a matter in aggravation.

Capri's detention, however, does have an impact on matters that are relevant to her

sentencing in this case. As noted earlier, as a result of her arrest, two of Capri's sons are living with their father Alexander Alcarese, one is living with his father John Rabine, and one is living with Capri's sister Dorothea Gale. The defense maintains that these arrangements are detrimental to the children and that this is a factor the Court should consider in sentencing Capri. Specifically, Juliet Yackel, a mitigation specialist retained by the defense, reports that she has been advised that since Capri's detention, her youngest child, Christian, has suffered from extreme stress and has experienced what are described as "panic attacks," which recently became severe enough that Gale took him to the hospital. The school Christian attends has not been advised of his mother's arrest, and perhaps has not been advised of Christian's own problems, and he is not receiving any counseling or therapy.

Yackel reports that she was told by personnel at the school attended by Capri's child Jonathan that he has been "shutting down" recently, that is, curling up on the floor, oblivious to attempts to attend to him. According to Yackel, the school principal told her he was unaware of Jonathan's autism diagnosis until Yackel reported it to him – though this lack of communication is likely just as attributable to Capri as to Jonathan's father, as Jonathan was already attending the school before Capri's recent arrest and detention. School personnel reported to Yackel that in light of Jonathan's apparent autism, they are concerned about the adequacy of the parenting he is now receiving – among other things, he is permitted by his father to ride a bicycle to and from school, which may be unsafe due to his condition. School personnel also report what Yackel described as unresponsiveness by Jonathan's father.

Yackel also spoke with the director of special education at the school attended by Capri's oldest son Brandon. The director expressed concern regarding the poor level of communication

that the school has with Brandon's parents, and she was unaware that Capri had been incarcerated. Yackel also advised that Capri's brother had reported to her that Brandon recently was arrested for shoplifting, though there is no documentation supporting this report.

Yackel reported that she was unable to reach the father of Brandon and Jordan recently to inquire about the boys' current status, and that none of Capri's relatives knew where or how to reach him.

The FBI agent who investigated the recent fraud charge on which Capri was arrested reported that in late February 2005, he went to Capri's home to execute a search warrant and that the house was filthy and in extreme disorder, lacked functioning lights, had what appeared to be several days of discarded food strewn throughout the kitchen, and had dirty clothing scattered over the floors. On cross-examination, defense counsel elicited that the search had taken place int eh early morning hours and that agents had taken photographs and a video recording during the search, which were not produced at the sentencing hearing for review. The Court also notes that the presentence report reflects a home visit or visits by a probation officer on unspecified dates before the end of 2004 but no report of similar conditions.

## Discussion

Under 18 U.S.C. § 3553(a), the Court must impose a sentence "sufficient, but not greater than necessary," to comply with the purposes set forth in § 3553(a)(2): reflecting the seriousness of the offense; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from future crimes by the defendant; and providing the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. In determining the particular sentence to be imposed, the

Court must consider those same factors, as well as several others: the nature and characteristics of the offense; the defendant's history and characteristics; the kinds of sentences available; the sentencing range under the Sentencing Guidelines; any pertinent policy statements issued by the Sentencing Commission; the need to avoid unwarranted disparities among defendants with similar records found guilty of similar conduct; and the need to provide restitution. 18 U.S.C. § 3553(a)(1) - (7). The Court has considered each of these factors in determining the appropriate sentence and summarizes its reasoning as follows.

The offense to which Capri pled guilty is a serious crime. WULA has suffered a loss of nearly $7,000,000. Capri had skill sufficient to allow her to deceive a sophisticated financial institution – an insurance company – over an extended time and to obtain (for Serfling's company) a loan of nearly $12,000,000, including a significant sum for herself. At various junctures, Capri has tried to suggest that her own responsibility in the scheme was relatively minimal. The investigating FBI agent reported to the probation officer that Capri had denied knowing the documents she submitted to WULA were fraudulent. The factual basis supporting Capri's guilty plea did not include an outright admission that she *knew* the Serfling and Serfin Trust documents were fraudulent, but rather only that she had a *strong suspicion* of their fraudulent nature sufficient to constitute the intent required for a conviction. And in her sentencing allocution to the Court, Capri again seemed to want to minimize her level of responsibility. But Capri's actions speak far louder than her words. She herself created fraudulent documentation that misrepresented that a company she had set up had placed insurance on the putative automobile dealership, documentation that led directly to the payment of over $200,000 to Capri for the nonexistent insurance premium. Capri cannot minimize this

aspect of the fraud by attempting to shift responsibility to anyone else. Between this payment and the real estate brokerage commission she received on the deal, Capri pocketed more money from the WULA loan than Serfling is claimed to have garnered. All things considered, Capri's own criminal responsibility was significant and clearly established.

Capri's criminal background reflects that she is not a newcomer to fraudulent schemes. By her own admission, she has engaged in several such schemes over the past dozen years, even without considering the other frauds and putative frauds not resulting in charges that are referenced by the government in its sentencing submission. The Court does not discount the explanation, advanced by Capri and her counsel, that these schemes were carried out during periods when Capri was under significant financial pressure and living in difficult circumstances. But that neither excuses her conduct nor minimizes its severity. In addition, these same pressures will exist following Capri's service of any sentence that the Court imposes. For this reason, and considering Capri's history and background, the Court is constrained to conclude that there is a significant likelihood that Capri will commit additional frauds in the future. Indeed, Capri's own apparent minimization of her responsibility for the present crime suggests an enhanced likelihood of recurrence of similar crimes in the future. No alternatives-to-incarceration program, even an excellent one, can provide certainty that this will not occur.

Consideration of Capri's characteristics includes consideration of her family situation. The available evidence, though somewhat scanty, suggests that Capri has done a relatively good job caring for her children and managing her family under very difficult circumstances. Similarly, the available evidence suggests that those who are currently taking care of her children may not be able to do as good a job as she has done. On the other hand, it is difficult to avoid the

observation that Capri's repeated decisions to commit serious crimes that she surely knew could subject her to incarceration are hardly a testament to good parenting.

The defense proposes a sentence of probation, or home confinement followed by supervised release, with conditions aimed at assisting Capri in avoiding further criminal activity in the future. Specifically, the defense proposes that as a condition of probation or supervised release, Capri be assigned to complete a program to be set up by the Benedict Center, a Milwaukee institution that (among other things) provides alternatives to incarceration for offenders. A program of this type is, without a doubt, an important component of an appropriate sentence. There is no question that Capri is in need of psychiatric care and counseling, and likely vocational training as well. *See* 18 U.S.C. § 3553(a)(2)(D). But these may be provided, and may be provided adequately in Capri's case, after (as well as during) service of a term of incarceration, not simply in lieu of incarceration.

In the Court's view, imposition of a sentence along the lines proposed by the defense as the sole sanction for Capri's criminal conduct would insufficiently reflect the seriousness of her crime, her criminal background, and the need to deter her and protect the public from future crimes. Capri's involvement in a sophisticated and well-planned fraud scheme not long after she had been given a modest sentence for her prior federal crime is a significant factor in the Court's assessment. Without months or perhaps within days after completing her term of supervised release, Capri was participating in a new fraud scheme much bigger than any in which she had previously been involved. The defense suggests that Capri's actions reflect the financial and personal pressures that were facing her. Even if this is so, it is also fair to conclude that Capri's actions reflect that at some level, the prior sentence did not give her an adequate "message"

regarding the consequences of such behavior.

In sum, the statutory purposes of reflecting the seriousness of the offense, providing just punishment, affording adequate deterrence, and protecting the public from further crimes by the defendant, all point in favor of imposition of a term of imprisonment, followed by a period of supervision that will include a requirement of mental health counseling and treatment, as well as vocational training and employment counseling, and other appropriate services.

Under the Sentencing Guidelines, Capri's criminal history category is III, and her total offense level is twenty-one, which yields a sentencing range of forty-six to fifty-seven months. The Court rejects the government's argument that Capri should actually be placed in criminal history category IV. The government contends that Capri's involvement in the present fraud scheme began while she was still on supervised release from her prior federal offense, thus requiring the addition of two more criminal history points under U.S.C.G. § 4A1.1(d). But the defense disputes the government's contention that Capri's *knowing* participation in the fraud scheme began before December 21, 2001, the date her supervised release term ended. The factual basis provided at the time of Capri's guilty plea is insufficient by itself to establish her involvement before that date; it states that Capri participated in the scheme starting "at least in or about December 2001," which is insufficiently precise to prove the government's point. The other matters proffered by the government suggesting earlier knowing involvement by Capri are likewise contested. On the record as it now stands, the Court cannot find that the government has established its contention by a preponderance of the evidence.

The Court also rejects Capri's argument that she is entitled to a two-level reduction for having a minor role in the offense under U.S.S.G. § 3B1.2. On the present record, the Court

cannot say that Capri's involvement was any less than that claimed of Serfling. Among other things, Capri appears to have received more of the proceeds of the fraud than Serfling. In addition, as previously discussed, Capri did not simply act as a conduit for someone else's fraudulent documentation but also submitted, on her own, fraudulent documentation that was aimed at garnering for herself a significant share of the proceeds.

The statutory requirement of consideration of the sentence called for under the Sentencing Guidelines as well as any applicable Sentencing Commission policy statements, *see* 18 U.S.C. § 3553(a)(4) & (5), if read fairly, includes consideration of any grounds for departure that might exist under the Guidelines. The government argues that the evidence regarding Capri's children is insufficient to establish the type of "extraordinary family circumstances" necessary to obtain a downward departure under the Guidelines.[2] *See* U.S.S.G. § 5H1.6. The Court disagrees. Under the Guidelines, a defendant's family ties and responsibilities ordinarily are not a proper basis for a departure. *Id.* "But 'ordinarily' is not 'never.'" *United States v. Wright*, 218 F.3d 812, 814 (7th Cir. 2000). A defendant's responsibilities to a child or an infirm family member properly may serve as a basis for a departure under the Guidelines, if the harm to the family member exceeds that which a normal family member would experience from incarceration of a caregiver, and care from other sources is not reasonable available to alleviate the harm. *Id.* at 815; *United States v.*

---

[2] The Court rejects the defense's suggestion that Capri's criminal history category might over-represent the seriousness of her criminal background or the likelihood she will commit future crimes, *see* U.S.S.G. § 4A1.3(b), for the reasons previously discussed. The Court also rejects the suggestion that Capri suffered from a significantly reduced mental capacity at the time of the offense within the meaning of U.S.S.G. § 5K2.13. There is nothing to indicate that Capri's depression, serious though it may have been, impaired her ability to understand the wrongfulness of her conduct or control the behavior constituting the offense. *See generally United States v. Roach*, 296 F.3d 565, 568-73 (7th Cir. 2002). The Court does consider Capri's mental and emotional condition, however, as one of her characteristics that is relevant to determining the ultimate sentence.

13

*Stefonek*, 179 F.3d 1030, 1039 (7th Cir. 1999). Such is the case here. The harm that any child experiences from the absence of an incarcerated parent is severe, and as such it is not a basis for departure under § 5H1.6 without more. But Capri's children, particularly Brandon and Jonathan, are at risk of significantly greater harm than the norm, due to the special needs they have based on their diagnosed medical and psychiatric conditions. Although family members are available as alternative caregivers for the children, as discussed earlier, the available evidence reflects they are not up to the challenge, at least for the long term.[3] They are capable of providing, at most, a stopgap remedy for a relatively modest period.

In sum, the Sentencing Guidelines prescribe a sentence for Capri in the range of forty-six to fifty-seven months but also allow for a downward departure from that sentence.

Having considered all the factors in § 3553(a), as summarized above, the Court concludes that a sentence of imprisonment is called for, but a somewhat shorter one than would be imposed if the only matter to be considered was the applicable Sentencing Guidelines range. The Court imposes a sentence of twenty-seven months incarceration, with Capri to be given credit for the time she has served in detention since her arrest on the new fraud charge. The Court finds that this sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in § 3553(a)(2). Under the Court's sentence, Capri will have approximately twenty-three months remaining on her prison term. If she earns the maximum credit for good behavior, she will serve about nineteen more months, the final two to three months of which likely will be served in community confinement. *See* 18 U.S.C. §§ 3624(b)(1) & (c). The Court will recommend that

---

[3] The Court rejects as unsupported the government's suggestion that the availability of foster care via the Department of Children and Family Services or its Wisconsin equivalent should be considered an adequate alternative.

14

Capri be housed at an institution where she may receive mental health counseling and treatment, as well as vocational training.

The term of imprisonment will be followed by a term of supervised release of three years, the maximum available under the law for the offense of conviction. *See* 18 U.S.C. § 3583(b)(2). The conditions of supervised release will include, in addition to the standard conditions, a requirement that Capri participate in mental health counseling and treatment at the direction of the Probation Office, and that she participate in and comply with a program of treatment, care, and training to be established by Benedict House, or if that is unavailable, an organization of similar type and capabilities. During the period of supervised release, Capri may not work in any capacity that involves financial planning, sale or brokerage of insurance or real estate, or obtaining or brokering mortgages, loans, extensions of credit, or investments, and may not apply for or obtain any loan, line of credit, charge account, or other extension of credit on her own behalf or on behalf of any other person or entity, without prior disclosure to and approval by the probation office. Capri must also provide the probation office with access to any requested financial information.

Restitution in the amount of $6,750,000, payable to Western United Life Assurance Company, is likewise imposed. In light of the restitution obligation and Capri's financial circumstances, the Court will not impose a fine or the cost of imprisonment or supervision. Payment of a $100 special assessment is mandatory.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: July 5, 2005

15